Warren **ANDERSON** and Dorothy
Anderson, Plaintiffs,

v.

**UNITED STATES** of America et al.,
Defendants.

No. 34101.

United States District Court
N. D. California, S. D.

Feb. 16, 1956.

Ernest E. Emmons, Jr., Davis & Colvin, San Francisco, Cal., for plaintiff.

Lloyd H. Burke, U. S. Atty., Frederick J. Woelflen, Asst. U. S. Atty., San Francisco, Cal., for defendant United States.

HAMLIN, District Judge.

This is an action by Warren and Dorothy Anderson against the United States under the Tort Claims Act, 28 U.S.C.A. § 2671 et seq., for the recovery of damages for the death of their three-year-old son who was drowned when he fell into a concrete canal operated by the Bureau

of Reclamation. The evidence shows that this canal, which was constructed and owned and maintained by the defendant through its Bureau of Reclamation, passed through the town of Clyde, Contra Costa County, California. The canal was 47 miles long and terminated in a reservoir near Martinez, California. It supplied water for industrial, household and irrigation purposes in Contra Costa County.

The Andersons lived about two or three blocks from the canal in the town of Clyde. In this area the canal was 23 feet wide at the top and 6 feet wide at the bottom, with slanted smooth sides. On the side of the canal toward where the Andersons lived, the surrounding land is lower than the top of the bank which is adjacent to the canal. The government had constructed a fence in this area which was about 70 feet from the center of the canal and about 40 feet from the top of the bank adjacent to the canal. This fence as originally constructed in 1942 or 1943 consisted of a 26-inch-high wire mesh at the bottom (the openings of the mesh being from two to four inches in size), and above this there were three strands of barbed wire between posts 10 to 12 feet apart. The height of the top wire from the ground was about 45 inches. From the fence to the top of the slope was an upgrade of about 40 feet on the ground, with a perpendicular rise of 22 to 23 feet. The slope of this bank was one-and-a-half to one. At the top of the slope was a flat gravel road about 10 feet in width, and then toward the canal was a down slope of about 5 feet in length with approximately a 3-foot drop to the edge of the concrete portion of the canal. The water, which was 4 to 6 feet deep, came almost to the edge of the canal. The slanted sides of the concrete portion of the canal, which were covered with water, were smooth. Ten or 15 feet inside the fence, on the slope, was a meter house in which were located meters measuring the amount of water taken at that point from the canal by the California Water Service Co., a utility serving that area. Alongside the meter house and leading to the top of the slope were steps made by placing wooden risers upright in the ground with level dirt between the risers. For many years it had been the practice of the employees of the California Water Service Co. to go daily to the meter house in order to read the meters. Their daily practice—known to and not objected to by the Bureau—was to drive a truck up to a few feet from the fence, using a well-defined dirt road, cross the fence and walk to the meter house on the slope. There was no gate in the fence at that location at the time of the accident. There was a well-defined dirt road used by these men in their motor vehicle which led from a street directly to the place alongside the fence where the truck was parked while the employees daily crossed the fence and went up the slope.

The testimony of two employees of the California Water Service Co. was that for a period of approximately a year prior to the date of the accident, the fence was in a state of disrepair as shown in the photograph Exhibit No. 2; in other words, the top three wires of the barbed wire strands were broken, were on the ground and were not stretched from post to post; the bottom 26-inch-high mesh was pushed toward the ground so that it was possible to step over it without any difficulty; in fact, these employees testified that they daily stepped right over the fence on their way to the meter house. The Bureau of Reclamation employed ditch riders to ride in automobiles along the road adjacent to the canal daily to inspect the flow of the water; however, the testimony showed that it was not one of the duties of these riders to examine the fence to see whether it was intact or not. Monthly, the superintendent of that district would ride in an automobile with another employee along the road adjacent to the canal and inspect the entire project. The canal could not be seen by a person standing at the fence; in fact,

the canal could not be seen until you had walked up to the top of the slope and were sufficiently high to look across the 10 feet and then down the slope into the canal.

From the time of the installation of the canal in 1942 or 1943 it had come to the Bureau's attention that children of all ages had trespassed upon the canal area. The information was in the office of the Bureau showing that some 24 persons had been drowned in the canal from the time of its installation up until the time of the accident in question, which occurred on November 16, 1953. These included many children of various ages. The details of all of these accidents were in the office of the Bureau and were known to the head of the Bureau. The Bureau had given various publicity releases to Parent-Teachers Associations and to schools and to newspapers, warning of the dangers of the canal. In 1947 a child of the age of 6 years had been drowned in an area about seven-tenths of a mile from the place of the accident in question here, and the fence at that time and place was a fence similar in construction to that which was located at the place of the present accident. The information in the Bureau Office showed that the investigators reported at that time and at other times that children played in the canal, played on the edge of the canal, fished in the canal, and that at times they were swimming in the canal.

The facts show that on the morning of the accident, shortly after 9 A.M., Joseph Anderson, aged 3, and his sister, aged 22 months, went out of their house to play. They were gone three or four minutes when their mother did not hear their voices any longer, and immediately went out to look for them. She looked at various places on both sides of the street, went down two or three blocks away toward a store, and finally went over to the area of the California Water Service Co. intake from the canal, and there she saw her daughter and another 3-year-old boy. The boy was standing on top of the bank inside the fence, and she asked where Joe was, and he motioned toward the canal and said, "He is in there". She said she had no personal knowledge of having seen the canal before and that her husband hadn't been there either, to her knowledge. She knew generally that there was a canal in that area, but had not seen any of the publicity or warnings put out by the Bureau, except on one occasion she had heard that some child had been drowned at some other location along the canal.

■ This is a case in which liability must be determined under California law.

The defendant contends that under Demmer v. City of Eureka, 78 Cal.App. 2d 708, 178 P.2d 472; Ward v. Oakley Co., 125 Cal.App.2d 840, 271 P.2d 536; Polk v. Laurel Hill Cemetery Association, 37 Cal.App. 624, 174 P. 414, and similar cases, that there is no liability upon the defendant, because of the fact that the child drowned was a trespasser and that a pond or pool of water is not per se an attractive nuisance which will subject the owner to liability in the event that a trespassing child is attracted to play thereon and is injured or drowned. However, that rule is subject to modification in favor of a child of tender years who has no appreciation of the danger involved.

■ In Long v. Standard Oil Co., 92 Cal.App.2d 455, 207 P.2d 837, 842, the Court states, " * * * an accumulation of water may be maintained under such conditions as to come within a recognized exception to the rule which bars recovery of damages by trespassers." The Court then quotes from Volume 2 of Restatement of Torts, Sec. 339, as follows:

" 'A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if (a) the place where the condition is maintained is one upon which the possessor knows or should

know that such children are likely to trespass, and (b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein.' "

In that case, where a 3 years and 10 months old child had drowned in a pool of water, the Court held that the condition shown there could reasonably be regarded as one which involved an unreasonable risk of death or serious bodily injury to children.

In Copfer v. Golden, 1955, 135 Cal. App.2d 623, 288 P.2d 90, 93, the Court again relied upon the rule set out in the Restatement of Torts quoted above, and stated, "The rule in California is substantially as stated in the Restatement. Long v. Standard Oil Co., 92 Cal.App.2d 455, 464–467, 207 P.2d 837; Marino v. Valenti, 118 Cal.App.2d 830, 842, 259 P.2d 84." The Court further said, as follows:

"Children of tender years have no foresight and scarcely any apprehensiveness of danger, a circumstance which those owning instrumentalities potential for harm must bear in mind; for it is every individual's duty to use toward others such due care as the situation then and there requires. Civ.Code, § 1714. 'The known characteristics of children, including their childish propensities to intermeddle, must be taken into consideration in determining whether ordinary care for the safety of a child has been exercised under particular circumstances.' Crane v. Smith, 23 Cal.2d 288, 297, 144 P.2d 356, 361. Of course,

if adults or children of such age as to ordinarily be capable of discerning and avoiding danger are injured while trespassing upon the property of another, they may be without remedy; while under similar circumstances children of tender years would be protected."

In the instant case, the child in question—one month over three years of age—had never been in the vicinity of the canal before. On the morning in question he, along with another 3-year-old boy, and his 22-months-old sister, had wandered from home. The evidence shows that they saw the truck of the California Water Service Co. employee parked near the fence, the truck and maybe the children having followed the well-defined road to this spot; they saw that employee step across the broken fence and go to the meter house. With the natural curiosity of children, when he returned they asked him what that was. When he drove away, what was more natural than for them to follow his example, cross over the broken fence which apparently was no obstruction to them, walk up the conveniently inviting steps to the top of the slope, and get in the vicinity of the dangerous canal? They could not see the canal until they were at the top of the slope leading down to the water. Whether Joseph stumbled, slipped, or rolled down the slope into the water is not known, but from the brief lapse of time as shown by the evidence, the accident must have happened almost immediately.

■■ A child is only required to exercise that degree of care which ordinarily is exercised by children of like age, mental capacity and experience. To hold that a child of 3 years should have a knowledge of the dangers of the area near the canal is to forget realities. The defendant knew of the dangers of the canal to small children. Its office was replete with facts concerning prior accidents. With a minimum of expense the fence could have been kept in repair, and children of that age who had no appre-

hension of the hazards involved could have been kept away from the dangerous waters.

All of the elements necessary for liability as set out in Section 339 of the Restatement of Torts are present in this case, and the California courts have said that such doctrine is the law in California.

Accordingly, judgment should be entered in favor of the plaintiffs and against the defendant in the sum of $8,000.

Findings of fact, conclusions of law and judgment to be prepared by plaintiffs.